# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JOSHUA QUINCY BURNS,

        Defendant-Appellant.

UNPUBLISHED
November 1, 2016

No. 327179
Livingston Circuit Court
LC No. 14-022070-FH

Before: OWENS, P.J., and SAWYER and SHAPIRO, JJ.

PER CURIAM.

Defendant appeals as of right from his conviction, after a jury trial, of second-degree child abuse, MCL 750.136b(3)(a), for which the trial court sentenced him to serve three years' probation with the first year in jail. We affirm.

This case arose when the victim, defendant's daughter, required repeated hospitalizations when only several weeks old. The examinations and tests that followed established that the infant had subacute blood in her cerebellum along with multilayered retinal hemorrhages in both eyes, the combination of which engendered the suspicion of physical abuse, in particular that the baby had been violently shaken, or subjected to repeated blunt impact, or a combination of both.

In testimony from another proceeding that was read into the record, defendant stated that he was alone with his infant daughter on March 15, 2014, while the child's mother visited a hairdresser. According to defendant, while he was feeding the child, the mother telephoned, after which, as defendant put the phone down, the child began to fall from his knee, in response to which he forcibly grabbed the child's face with his right hand. Defendant testified that he did not remember clearly if the child's head struck a coffee table, but that he tended to doubt it. He added that she did not strike the floor, and admitted to a "knee jerk reaction" to prevent a fall. Defendant recounted observing a scratch on the left side of the child's forehead, but stated that she otherwise appeared unharmed and did not cry until he applied a cold washcloth to her forehead.

## I. ASSISTANCE OF COUNSEL

Defendant asserts that he was convicted without the benefit of effective assistance of counsel, and that the trial court erred in denying his motion for a new trial for that reason, or, alternatively, for an evidentiary hearing[1] on the matter.

A trial court's decision to grant or deny a motion for a new trial is reviewed for an abuse of discretion. *People v Cress*, 468 Mich 678, 691; 664 NW2d 174 (2003). A trial court's decision whether to hold an evidentiary hearing is similarly reviewed for an abuse of discretion. *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008).

The right to effective assistance of counsel during a criminal trial is guaranteed by our federal and state constitutions. US Const, Am VI; Const 1963, art 1, § 20. See also *People v Heft,* 299 Mich App 69, 80; 829 NW2d 266 (2012). A defendant pressing a claim of ineffective assistance bears a heavy burden of overcoming a strong presumption that defense counsel provided adequate representation. *People v Vaughn,* 491 Mich 642, 670; 821 NW2d 288 (2012). Defense counsel has great discretion with respect to the trial tactics employed, and this Court may neither substitute its own judgment for that of defense counsel, nor otherwise second-guess counsel on matters of trial strategy. See *People v Pickens,* 446 Mich 298, 330; 521 NW2d 797 (1994); *People v Payne,* 285 Mich App 181, 190; 774 NW2d 714 (2009).

In order to prove that defense counsel failed to provide effective assistance, the defendant must establish that "(1) defense counsel's performance was so deficient that it fell below an objective standard of reasonableness and (2) there is a reasonable probability that defense counsel's deficient performance prejudiced defendant." *Heft,* 299 Mich at 80–81. To prove that defense counsel's representation fell below an objective standard of reasonableness, defendant must show that counsel's conduct was outside the scope of professionally competent assistance under the circumstances. *Vaughn,* 491 Mich at 670. To prove that defense counsel's deficient performance resulted in prejudice, the defendant must show that the outcome of the proceeding would have been different but for counsel's errors. *Heft,* 299 Mich App at 81. The defendant "must also show that the result that did occur was fundamentally unfair or unreliable." *People v Lockett,* 295 Mich App 165, 187; 814 NW2d 295 (2012). This Court will not evaluate defense counsel's performance with the benefit of hindsight. *People v Russell,* 297 Mich App 707, 716; 825 NW2d 623 (2012).

### A. THE PROSECUTION'S EXPERT'S TESTIMONY

Defendant argues that defense counsel provided ineffective assistance by failing to object to the admission of, or request a *Daubert*[2] hearing regarding, the prosecution's expert's

---

[1] See *People v Ginther,* 390 Mich 436; 212 NW2d 922 (1973).

testimony that the victim's retinal hemorrhages were "very, very highly specific for repetitive acceleration deceleration," or that the infant's cerebral hemorrhage, subacute intracranial blood, and retinal hemorrhages together are "close to 100 percent" diagnostic of abuse in the absence of any other plausible explanation. Defendant contends that those assertions greatly misled the jury about the extent to which science supported her diagnosis of abuse, and that any reasonable defense attorney would have sought to exclude them under *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993) and MRE 702 as scientifically unsupported or even contradicted.

MRE 702 governs the admissibility of expert testimony:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The underpinning of MRE 702 is that the "trial court must ensure that all expert opinion testimony, regardless of whether it is based on novel science, is reliable." *People v Steele,* 283 Mich App 472, 481; 769 NW2d 256 (2009).

"When evaluating the reliability of a scientific theory or technique, courts consider certain factors, including but not limited to whether the theory has been or can be tested, whether it has been published and peer-reviewed, its level of general acceptance, and its rate of error if known." *People v Kowalski,* 492 Mich 106, 131; 821 NW2d 14 (2012) (MARY BETH KELLY, J., joined by YOUNG, C.J., and ZAHRA, J.). The trial court "acts as a gatekeeper and has a fundamental duty to ensure that the proffered expert testimony is both relevant and reliable," but " '[b]ecause there are many different kinds of experts and expertise, this inquiry is, by necessity, a flexible one, and a court determining the admissibility of expert testimony may consider reliability factors pertinent to the particular type of expert testimony offered and its connection to the particular facts of the case.' " *Id.* at 120, quoting *Daubert*, 509 US at 594–595. "[T]he trial court's role as gatekeeper does not require it to search for absolute truth, to admit only uncontested evidence, or to resolve genuine scientific disputes." *Unger,* 278 Mich App at 217. Rather, the proper inquiry is whether the expert opinion is rationally derived from a sound foundation, not whether it is ultimately correct or universally accepted. *Id.*

In denying defendant's motion for a new trial with respect to the *Daubert* issue, the trial court stated as follows:

> [W]hat this looks to the Court as is really sound trial strategy. . . . [W]hen I review [defense counsel's] affidavit it's almost as if he's looking back again now

---

[2] *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579, 589; 113 S Ct 2786; 125 L Ed 2d 469 (1993) ("the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable").

with the benefit of hindsight maybe the better strategy would have been to have gone down the Daubert route to see if he could have been successful in excluding all or part of [the prosecution's expert's] testimony which in the end I'm not even sure he would be successful at. Because . . . what the Court's understanding is of it at this time is that there's disagreement in the medical community regarding this issue with regards to abusive head trauma and other explanation for children to have those types of injuries that [the instant victim] had. . . . And so that is a question for the jury to decide. . . . I'm not confident that a Daubert hearing is the mechanism by which the Court's not going to decide creditability [sic] issues . . . . The standard is different with regards to Daubert. It's essentially whether it's reliable science. And what . . . I've read is that there's somewhat of a split across the medical community. . . . I'm not convinced that this wasn't sound trial strategy on [defense counsel's] part because he did bring in a number of experts to refute [the prosecution's expert's] testimony. Two . . . very good very qualified experts . . . . [Defense counsel] brought in not one but two pediatricians . . . coming from . . . opposite sides of the state. . . . So . . . this jury had between it three different experts all in their field just working in the same jobs at different hospitals and they disagreed. And so they decided that credibility issue and that is an issue for the jury. So I'm not convinced that this wasn't sound trial strategy on [defense counsel's] part. . . . Secondly . . . I'm not convinced that the result would have been different because I'm not even sure that he . . . would've been successful at a Daubert hearing. And I've got to show that there's a reasonable probability and I don't find that to be the case here.

Defendant states that he does not "dispute the abusive head trauma hypothesis as a whole," but instead challenges the expert on the ground that her specific testimony was based on junk science. He contends that defense counsel should have raised a *Daubert* challenge with respect to the testimony that the victim's retinal hemorrhages were "very specific or highly specific" for abuse. Defendant first maintains that the victim's "retinal hemorrhages were the *only*[3] symptoms on which [the prosecution's expert] relied to conclude that [the child] had suffered a 'repetitive acceleration deceleration injury.'" He argues that the expert would not have been able to defend this testimony because "[t]here is simply no scientific basis for contending that retinal hemorrhages are reliably diagnostic of abuse." Next, he maintains that "the claim that only abuse . . . (or a rollover accident or severe crush injury) can cause severe retinal hemorrhages is outdated and false." Third, he asserts that "[r]etinal hemorrhages, even severe ones, have also been found in an ever-expanding collection of disorders, many of which have nothing to do with trauma." Fourth, he maintains that the expert's "claim that retinal hemorrhages that are severe, multi-layered or extend to the ora serrata are diagnostic of abuse is also unsupported by the literature." In summation, defendant argues that the "underlying premise of [the expert's] testimony is contrary to the relevant literature." Defendant further argues that the prosecution's expert never provided a basis for her opinion, and points out that

---

[3] This assertion is inaccurate, given that the expert clearly stated that she was also relying on the presence of subacute blood in the victim's cerebellum.

her opinion was contradicted by defense experts. Defendant characterizes the challenged testimony as "nothing but irresponsible speculation presented as if it were scientific fact."

Defendant next contends that defense counsel should have raised a *Daubert* challenge with respect to [the prosecution expert's] testimony that the victim's combination of symptoms were "close to 100 percent" indicative of abuse.[4] Defendant contends that the assertion had no scientific basis and that "[w]hile no definitive research exists on the accuracy of [abusive head trauma] diagnoses, research on misdiagnosis in other contexts shows that errors are common in all areas of medicine . . . ." Defendant also contends that "[t]here is now near-universal agreement, even among the strongest of proponents of the [abusive head trauma] diagnosis, that the presence of [subdural hemorrhage, retinal hemorrhage, and encephalopathy] is not enough to diagnose abuse with a high degree of confidence."

In support of each one of the above contentions, defendant refers us to several articles that point out that retinal hemorrhage can result from causes other than abuse. However, none of the articles dispute the view that abuse is a likely, if not the most likely, cause of such injuries in infants, and none appear to consider the likelihood of an incident consistent with what defendant described. Defendant makes a credible argument that Dr. Mohr's statement involving "close to 100%" is subject to criticism as overbroad, but defendant does not present scientific literature sufficient to demonstrate that Dr. Mohr's opinion as to the cause of the child's injury was inconsistent with generally accepted scientific principles and methods. Defendant does not provide any legal analysis to show that defense counsel would have succeeded with an attempt to have Dr. Mohr's opinion evidence excluded.

In *People v Ackley*, 497 Mich 381, 391-302; 870 NW2d 858 (2015), our Supreme Court acknowledged the "prominent controversy within the medical community regarding the reliability of [shaken-baby syndrome or abusive head trauma] diagnoses" and concluded that defense counsel was ineffective in that case for failing to become adequately versed in that technical subject matter or engage an expert to rebut the state's expert. *Id*. at 392. By contrast, in this case defense counsel did retain two experts in an attempt to rebut Dr. Mohr's conclusions, but even these experts testified that the victim's retinal hemorrhages were consistent with abusive head trauma, that retinal hemorrhaging is "pretty darn specific for trauma," that "subdural hematomas and retinal hemorrhages of the type [the victim] had are usually diagnostic of abusive head trauma," that the science with respect to shaking as a mechanism for producing multilayered retinal hemorrhages was a "good theory," that the mechanisms other than abuse for retinal hemorrhages were generally rollover type accidents or head crushing accidents, and that "stopping and starting repeatedly often is the primary culprit" behind head trauma of the sort at issue. One defense expert testified that in his practice he had "never had a child under three months of age, who had subdural hematomas and the extensive bilateral multilayer retinal hemorrhaging that [the victim] had, not be diagnosed as suffering from abusive head trauma."

---

[4] We note that the expert offered this testimony in response to a juror who was asking about the expert's personal experience.

Accordingly, testimony from defendant's own experts undermines defendant's argument that the challenged testimony from the prosecution's expert was "junk science." The controversy within the medical community noted by defendant on appeal presents, at least in this case, a question of credibility, a so-called battle of the experts, as the court below noted. The question was therefore properly placed before the jury and defense counsel, in addition to presenting his own experts, extensively criticized the reliability of the prosecution's expert's opinion through cross-examination and closing argument. For these reasons, defendant has failed to show any deficiencies in defense counsel's performance in connection with the prosecution's expert's trial testimony.

## B. E-MAIL EXCHANGE

Defendant also argues that he was denied the effective assistance of counsel by trial counsel's failure to adequately respond to the prosecuting attorney's hearsay objection to admission of an e-mail exchange between the prosecution's expert and Dr. Levin, another doctor whom the prosecution's expert had consulted by e-mail. He contends that counsel failed to exploit an opportunity for impeachment because the e-mail revealed that the expert had "already made up her mind and was not open to reconsidering her diagnosis, a showing that goes directly to the credibility of her diagnosis."

In the e-mail exchange at issue, the prosecution's expert described the victim's condition to a colleague, referenced several attachments, and asked for the colleague's "thoughts." The colleague replied, "Impressive documentation. Very well done. Not sure what the question is. I can't think of another diagnosis other than abuse assuming no obvious coagulopathy or other . . . event." The prosecution's expert immediately responded, "My question was mainly about what to say (if anything) about the thrombophilia." The colleague in response asked, "Do you mean thrombocytosis?" and continued, "Either way we have no idea what this might do re retinal bleeding and could be considered to throw the retinal findings into question. We just don't know."

Defendant does not argue on appeal that the comments in Dr. Levin's e-mail were admissible as substantive evidence and it is clear that the trial court properly ruled that they could not be so admitted. Defendant argues only that his counsel was ineffective for failing to use the e-mails to impeach Dr. Mohr on the grounds that she did not consider other possibilities. However, had defense counsel attempted to introduce the e-mails for impeachment, the trial could have excluded them for that purpose without abusing its discretion given the likelihood that they would be construed substantively, that they lacked explanation, that they lacked explanation, and the fact that Dr. Mohr testified that she did not consider whether the child's thrombocytosis would alter her conclusions. Moreover, the defense has not demonstrated a reasonable probability that admission of the e-mail for a limited purpose would have resulted in a different outcome. Defendant has thus failed to show that the trial court abused its discretion by denying defendant's motion for a new trial. And because the existing record was sufficient to assess defendant's claims of ineffective assistance, the trial court did not abuse its discretion in declining to convene an evidentiary hearing to explore the matter further.

## II. MOTION FOR DIRECTED VERDICT

Defendant argues that the trial court erred in denying his motion for a directed verdict. When determining whether a trial court erred in denying a motion for a directed verdict, "this Court reviews the record de novo to determine whether the evidence presented by the prosecutor, viewed in the light most favorable to the prosecutor, could persuade a rational trier of fact that the essential elements of the crime charged were proved beyond a reasonable doubt." *People v Aldrich*, 246 Mich App 101, 122; 631 NW2d 67 (2001).

To establish the offense of second-degree child abuse predicated on a reckless act, the prosecution was required to prove that defendant had care of, or authority over, the child under 18 years old when the abuse allegedly occurred, and that defendant did commit a reckless act that resulted in serious physical harm to the child. MCL 750.136b(3)(a). See also M Crim JI 17.20. In challenging the sufficiency of the evidence in this case, defendant argues that the prosecution failed to introduce evidence that defendant, as opposed to someone else, committed the pertinent reckless act.

"[I]dentity is an element of every offense," *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008), and, as with every other element of the crime, the prosecution must prove the defendant's identity as the perpetrator beyond a reasonable doubt, *People v Kern*, 6 Mich App 406, 409-410; 149 NW2d 216 (1967). Identity may be proved by circumstantial evidence and any associated reasonable inferences. *People v Nelson*, 234 Mich App 454, 459; 594 NW2d 114 (1999); *Kern*, 6 Mich App at 409-410.

In denying the motion for a directed verdict, the trial court explained as follows:

[T]here's no direct evidence . . . whether the defendant did some reckless act. [A]s argued by [the prosecuting attorney] . . . circumstantial evidence . . . is entirely appropriate for this Court to consider. And I do find that there's sufficient circumstantial evidence that a rational trier of fact could find the elements proven that the defendant did some reckless act. I'm looking at some of the evidence presented that the defendant was alone with the baby . . . for approximately an hour. There's testimony that the baby was fine up until that point. There were no . . . symptoms noted when mom returns. There's factual [sic] bruising, a scratch with blood, and then the next day these symptoms began. The vomiting started . . . . And the testimony is that the subdural hemorrhage or hematoma, the retinal hemorrhage, and the medical testimony gives the timeframe . . . two to seven days and this, the time period that's alleged by the People that dad's alone, where the baby has at least some facial injuries. The medical testimony puts these baby's injuries, in that timeframe. So based on that I'm going to deny the motion for a directed verdict.

We agree that, despite the lack of direct evidence linking defendant to the victim's injuries, the circumstantial evidence, when viewed in a light most favorable to the prosecution, supported an inference that defendant was the person who committed a reckless act that caused

serious physical harm to the infant. The prosecution's expert's testimony, which was based in part on the results of an MRI administered on March 18, 2014, dated the subacute blood in the cerebellum in the three-or-four to seven-day range, a neuroradiologist dated the subacute blood in the cerebellum at "probably two to four days old," and defendant's expert testified that he "did not dispute the two to seven day range for the subacute" blood. The expert testimony ultimately established that the subacute blood in the victim's cerebellum and the retinal hemorrhages most likely occurred between March 11 and March 16, 2014, during which there is no dispute that the only persons who were alone with the victim were, respectively, defendant and the victim's mother. There is also no dispute that the victim, as an infant only 11 weeks old, could not have caused the injuries to herself. Defendant was alone with the victim for approximately one hour and 20 minutes on March 16, 2014, and the day afterward the victim began exhibiting vomiting, pale color, and lethargy.

Viewing the evidence in the light most favorable to the prosecution, and allowing for all reasonable inferences that might be drawn from it, we conclude that a reasonable trier of fact could have concluded beyond a reasonable doubt that it was defendant who committed a reckless act that resulted in serious physical harm to the victim. Accordingly, we affirm the trial court's decision to deny defendant's motion for a directed verdict.

## III. JURY INSTRUCTIONS

Defendant argues that the trial court erred in refusing to instruct the jury specially on the meaning of "reckless act." We disagree. Questions of law, including questions on the applicability of jury instructions, are reviewed de novo on appeal. *People v Perez,* 469 Mich 415, 418; 670 NW2d 655 (2003); *People v Gonzalez*, 468 Mich 636, 641; 664 NW2d 159 (2003).

MCL 750.136b(3) sets forth the bases for conviction of second-degree child abuse. Subsection (a) specifies where "[t]he person's omission causes serious physical harm or serious mental harm to a child or if the person's reckless act causes serious physical harm or serious mental harm to a child." "Reckless act" is not defined.

Defendant filed a pretrial motion requesting that the trial court supplement the jury instruction on second-degree child abuse by instructing the jury on the statutory definition of "reckless act" that is set forth for purposes of the vulnerable adult abuse statute. MCL 750.145n(2) states that second-degree vulnerable adult abuse occurs "if the reckless act or reckless failure to act of the caregiver or other person with authority over the vulnerable adult causes serious physical harm or serious mental harm to a vulnerable adult." MCL 750.145n(4) in turn states that fourth-degree vulnerable adult abuse occurs "if the reckless act or reckless failure to act of the caregiver or other person with authority over the vulnerable adult causes physical harm to a vulnerable adult." MCL 750.145m(p) defines "reckless act or reckless failure to act" as "conduct that demonstrates a deliberate disregard of the likelihood that the natural tendency of the act or failure to act is to cause physical harm, serious physical harm, or serious mental harm." The trial court denied the motion, and in the end instructed the jury in accordance with M Crim JI 17.20, which advises that conviction of second-degree child abuse requires finding that the defendant "did some reckless act" resulting in "serious physical harm" while offering no definition of "reckless act."

Defendant asserts that the term "reckless" has a peculiar legal meaning in Michigan law in that it includes the conscious disregard of a known risk of harm, and argues that this is not generally within the common understanding of jurors. According to defendant, the trial court's failure to clarify the legal meaning of "reckless" in that regard invited the jury to find defendant guilty in connection with conduct falling short of criminal recklessness, such as ordinary negligence.

Instructive is *People v Gregg*, 206 Mich App 208, 212; 520 NW2d 690 (1994), where this Court rebuffed a claim that the lack of a statutory definition of "reckless" for purposes of fourth-degree child abuse left the jury with "unstructured and unlimited discretion to determine whether an offense has been committed" on the ground that dictionary definitions confirmed that the plain and ordinary meaning of the word well enough established that the pertinent statute "prohibits the commission of a reckless act that causes physical harm to a child."

This Court's observation in *Gregg* that a lay dictionary defined "reckless" to include "'utterly unconcerned about the consequences of some action; without caution; careless,'" *id.*, quoting *The Random House College Dictionary, Revised Edition,* militates against defendant's argument that recklessness in the sense of conscious disregard of a known risk of harm was not part of the common understanding that his jurors brought to their deliberations. Further, because the wording in which "reckless" appears for purposes of fourth-degree child abuse is virtually identical to the wording in which it appears for purposes of second-degree child abuse, we read *Gregg*'s determination that no elaboration on the meaning of "reckless" is required with regard to the former as deciding the question in connection with the latter as well.

For these reasons, the trial court did not err in refusing to borrow from the vulnerable adult abuse statute when instructing the jury on second-degree child abuse.

Affirmed.


/s/ Donald S. Owens
/s/ David H. Sawyer
/s/ Douglas B. Shapiro

-9-